IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ERIC R. LEON,                        )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )      1:06cv979
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
          Defendant.                 )


<u>MEMORANDUM OPINION</u>

_____Before the Court are the parties' cross-motions for summary
judgment. Pursuant to 42 U.S.C. § 405(g), plaintiff Eric Leon
seeks reversal of the defendant's decision that he is not under a
disability within the meaning of 42 U.S.C. §§ 402(d), 416(i),
423(d), and 1382c and, therefore, not entitled to either
disability insurance benefits ("DIB") or child's insurance
benefits under Title II of the Social Security Act ("Act"), or
supplemental security income payments ("SSI") under Title XVI of
the Act. Defendant, Michael J. Astrue,[1] Commissioner of Social
Security ("the Commissioner") seeks an affirmance of that denial.
For the reasons stated below, the Court will grant the
plaintiff's motion, reverse the Commissioner's decision, and

_____

     [1] When this civil action was filed, Jo Anne B. Barnhart was
the Commissioner of Social Security. On February 12, 2007,
Michael J. Astrue replaced her as Commissioner. The caption of
this civil action and all references to the Commissioner have
been amended to reflect this change.

remand this matter to the Commissioner for an award of benefits to the plaintiff.

I. Procedural History

Eric Leon filed his applications for DIB, child's insurance benefits, and SSI on July 11, 2003, alleging that he became disabled as of February 15, 2003 due to affective disorders. His applications were denied initially and upon reconsideration. Leon filed a timely request for a hearing by an Administrative Law Judge ("ALJ"). The hearing was held on August 12, 2004, before ALJ Eugene Bond, who conducted a de novo consideration of Leon's claims. Leon was represented at the hearing by Orlando Barrios, a non-attorney. Besides Leon, his treating therapist, Charlene Bartlett, and a vocational expert, Kathy Sampeck, also testified at the hearing. ALJ Bond issued his decision on September 2, 2004 finding that Leon retained sufficient residual functional capacity to perform full-time work, that there were jobs in the national economy that Leon could perform, and that therefore, Leon was not disabled within the meaning of the Act.

Leon filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council on October 28, 2004. On February 10, 2005, the Appeals Council remanded the decision to the ALJ with specific instructions for further development of the record and a new hearing. Leon, who was again represented by Barrios, appeared before ALJ Bond on October 25,

2

2005. In addition to Leon, Naoji Watson, a second treating therapist, and vocational expert Robert Lester testified. On January 26, 2006, ALJ Bond issued a new decision, making the same findings with regard to Leon's residual functional capacity and jobs in the national economy as he had in his first decision and again concluding that Leon was not disabled. Leon again sought review of ALJ Bond's decision, but on June 2, 2006, the Appeals Council declined to review ALJ Bond's second decision, which became the final decision of the Commissioner as to Leon's applications for benefits.

II. Factual Background

        Leon was twenty years old on the date of the alleged onset of disability, in February 2003. He had completed high school and two years of college before the onset of his disability, and had relevant work experience in clerical and office automation work. Leon began using marijuana and phencyclidine ("PCP") at age twelve and was regularly using these drugs by age thirteen. He also has a history of alcohol abuse.

        About two and a half months after the alleged onset of his disability, Leon was hospitalized at Vancor Hospital, was released, and then was admitted at Inova Mount Vernon Hospital from May 8 until May 22, 2003, due to decompensation. A.R. 190. At Mount Vernon, the attending physician noted that Leon's "thought process was slow. Blocking was present. Paranoid

ideation and paranoid thoughts were present. Underlying paranoid delusions were present. The patient reported having active auditory hallucinations but denied that the voices were commanding. The patient appeared to be anxious and fearful...Judgment and insight were severely impaired." A.R. 190. The diagnostic impression of the treating physician was PCP-induced psychosis, bipolar disorder, major depression with psychotic features, and schizoaffective disorder precipitated by substance abuse. A.R. 193.

Leon has been formally diagnosed with schizophrenic disorder, bipolar disorder, and anxiety disorder. Since his release from inpatient treatment, the Fairfax-Falls Church Community Services Board ("CSB") Mental Health Service has provided treatment at several residential facilities, including the Woodburn Center (Mobile Crisis Unit), Cornerstones Dual Diagnosis Residential Program, Franconia Road Treatment Center, and the Residential Extensive Dual Diagnosis Program ("REDD Program"). At these facilities, Leon has received ongoing drug and therapeutic treatment for schizophrenia. Throughout his course of treatment he has complained of various symptoms including manic thoughts, fatigue, anxiety around crowds and strangers, difficulty with concentration, delusions and auditory hallucinations, and difficulty maintaining personal hygiene. Since his release from the hospital and his participation in

4

residential treatment programs, Leon has abstained from using either alcohol or drugs.

The treatment records establish that Leon has been prescribed various dosages of anti-psychotic drugs, including Clozaril, Clozapine, Geodon, Zyprexa, Cogentin, and Luvox. A.R. 190, 239, 639, 715. These drugs cause side effects such as fatigue and dizziness, and patients are warned not to operate machinery or motor vehicles until they have established the level of their reaction to the drugs. Clozaril and Clozapine require bi-weekly blood draws to monitor the drugs' effect on the liver. Physicians' Desk Reference 2155 (Lori Murray et al., eds., 2001).

Leon has been treated by several doctors and therapists, including Dr. Elaine Green, Dr. Charles Sacks, Dr. Craig Krause, therapist Michael Colbert, therapist Charlene Bartlett, and therapist Naoji Watson. Reports from these various doctors and therapists have been mixed. As the defendant asserts, a CSB Service Plan Review after Leon's discharge from Inova Mount Vernon Hospital noted that Leon "has made significant progress on the new medication regime. Client reports auditory hallucinations have stoped [sic] at this time." A.R. 229, 626-627.[2] The same report, however, stated that "client's ability to function

---

[2] It is difficult to evaluate the exact timing of this report, which is reproduced verbatim at least twice in the administrative record, signed by two different therapists and dated more than a year apart.

independently appears limited at this time. Client has difficulty setting priorities, and following through on priorities." That same report noted that "Client progress has been sporadic." Id.

Dr. Green, Leon's treating therapist throughout 2003, wrote in August 2003 that Leon "appears to have limited insight regarding his mental illness and has been unable to live independently in the community." A.R. 226-28. However, she also noted Leon's progress throughout the year, including his positive responses to medication and his cooperation with the therapy regime. In November 2003, Dr. Green reported that Leon's mood was stable and normal, his thought process was not disorganized, and his psychosis was symptomatically controlled, although he continued to complain of fatigue as a side effect of his medications. A.R. 244-45.

Therapist Bartlett, who began treating Leon in 2003 and continued to treat him through the time of his second hearing with the ALJ in 2005, completed a Mental Impairment Questionnaire on August 4, 2004 that was endorsed by Dr. Charles Sacks. A.R. 304-309. Although Bartlett noted that Leon's symptoms were controlled by medication and rated his abilities as "good" in most categories of mental abilities and aptitude needed for unskilled work, she also wrote, "Both client's disorder (schizophrenia) and the medications he is taking for it (Clozaril) can cause memory problems and fatigue. This interferes

with client's ability to maintain a schedule needed for employment." A.R. 307. She further explained in a letter summarizing the effects of Leon's illness that Leon would need "continued intervention by the mental health system to remain stable within the community and out of the hospital" and that it would be "highly unlikely that he [would] be able to return to work." A.R. 310.

Treatment notes from 2004 and 2005 report Leon's sporadic and inconsistent progress. Therapist Watson noted in September 2004 that "client appears in bright mood and affect appears in stable condition," but a report from September 2005 stated, "client appears depressed and anxious and withdrawn." A.R. 452, 339. Other therapy notes from various therapists reflect similar inconsistencies in progress: client was "somewhat anxious," (June 21, 2004, A.R. 478); "client appeared depressed, unshaved face, no interest to talk, sounded stuffed," (June 30, 2004, A.R. 472); "[client] appropriately dressed and clean...calm and relaxed and engaged in session," (September 30, 3004, A.R. 450); "client appears agitated and subdued," (November 5, 2004, A.R. 442); "client presented as calm and relaxed. He was very talkative and optimistic about things in his life," (February 2, 2005, A.R. 412); "client appears somewhat lethargic and tired," (May 20, 2005, A.R. 389); "client presented as calm and relaxed," (June 8, 2005, A.R. 379); "client presented as sleepy and lethargic,"

(August 31, 2005, A.R. 343); "client appears tired but stable,"
(September 16, 2005, A.R. 340); "client has appeared somewhat
depressed and disorganized," (September 21, 2005, A.R. 336). The
record also reflects that Leon has lived in a structured,
residential treatment environment since 2003, but even in that
environment, treatment notes reflect that Leon sometimes failed
to stay in contact with the staff, failed to keep to a regular
schedule in attending meetings, and routinely had to be awakened
by staff in the mornings in order to get started on his day. A.R.
394, 404, 466, 468.

In both his opinions, ALJ Bond relied extensively on the
concluding opinion of Dr. Mary E. Cronin, a non-treating, non-
examining physician from Disability Determination Services
("DDS"), who reviewed the medical records in Leon's file in
September 2003. Dr. Cronin filled out a Psychiatric Review
Technique in which she found Leon to display symptoms of
Schizophrenia (Paranoid) and Substance Addiction Disorders.[3] In
her Rating of Functional Limitations evaluating Leon's mental
health under the Code of Federal Regulations ("C.F.R."), Dr.
Cronin found Leon to be "moderately" limited in the three broad
areas: "restriction of activities of daily living," "difficulties
in maintaining social functioning," and "difficulties in

---

[3] Dr. Cronin appears to have evaluated Leon's records only in
2003; the record contains no evidence of any follow-up evaluation
of Leon's records from 2004 or 2005.

maintaining concentration, persistence, or pace," and noted that he had experienced "one or two" episodes of decompensation, each of extended duration.[4] A.R. 299.

In her Mental Residual Functional Capacity Assessment, she found Leon to be not "not significantly limited" in most areas of assessment, but "moderately limited" in "ability to understand and remember detailed instructions," "ability to carry out detailed instructions," "ability to maintain attention and concentration for extended periods," "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," and "ability to accept instructions and respond appropriately to criticism from supervisors." A.R. 301-302. These areas of limitation comported with those noted by therapist Bartlett and Dr. Sacks, although these treating physicians rated Leon as "poor" in "ability to maintain regular attendance and be punctual" and "ability to complete a normal workday and workweek

---

[4] Dr. Cronin used the rating scale in compliance with 20 C.F.R. § 404.1520a that included the options of "none," "mild," "moderate," "marked," and "extreme." A finding of "mild" or "none" in the first three functional areas and "none" in the fourth area results in a conclusion that a claimant's impairments are not severe.

9

without interruptions from psychologically based symptoms." A.R. 307. Nevertheless, in her functional capacity assessment, Dr. Cronin concluded that "the claimant is capable of routine, nonstressful work, as long as he remains clean and sober." A.R. 303.[5] Dr. Cronin's emphasis on Leon remaining "clean and sober" evidences an opinion heavily biased by Leon's prior drug and alcohol problems, in spite of the fact that Leon's symptoms have persisted even while he has abstained from drug and alcohol use.

In stark contrast to Dr. Cronin's 2003 assessment, Dr. Craig Krause, a psychiatrist who began treating Leon in August 2005 shortly before his second hearing with the ALJ, also diagnosed Leon with Schizophrenia (Paranoid), but noted that Leon's "severe mental illness significantly impacts in his ability to function fully independently on a daily basis. He has severe paranoia, anxiety, and depressive mood episodes that affect his ability to establish and maintain healthy social relationships." A.R. 712. Dr. Krause filled out a Mental Impairment Questionnaire endorsed by treating therapist Watson in October 2005 in which he rated Leon as "fair" or "poor" in all mental abilities and aptitude needed to do unskilled work, and found Leon to display "marked" limitations on the same functional limitations analysis that Dr.

---

[5] The record clearly establishes that Leon's medicine regime continued to be adjusted through 2004 and 2005, belying any suggestion that Leon was completely stabilized by his medication in 2003.

Cronin had performed two years earlier on the basis of reviewing only the record. A.R. 711-16. As had therapist Bartlett in 2003, Dr. Krause found that the severity of Leon's impairments existed independent of any drug and/or alcohol abuse. He further noted that Leon continued to reside in a REDD Program extension apartment which provided him with extensive psychotherapeutic, case management, and mental health supportive services and medication management.

A fair reading of this record clearly shows that none of the many treating physicians and therapists explicitly found that Leon is capable of working full-time on a sustained basis. To the contrary, therapist Watson, Dr. Krause, therapist Bartlett, and Dr. Sacks (through his endorsement of therapist Bartlett's evaluation) have all uniformly agreed that Leon's symptoms and treatment would interfere with his ability to maintain a regular job, and all agree, as recognized by Dr. Cronin, that Leon has demonstrated difficulty with the ability to maintain regular attendance and be punctual within customary tolerance. All have also agreed, again as acknowledged by Dr. Cronin, that Leon has a record of difficulty with completing a normal workday or workweek without interruptions from psychologically based symptoms.

To his credit, between the first and second hearings, Leon obtained his driver's license and a part-time job at a recreation center. At the time of the second hearing, he was working twelve

hours per week at night. Despite having a driver's license, however, the record shows that he continued to rely on public transportation and rides provided by REDD.

III. The Administrative Decision

In his second decision, the ALJ applied the five-step evaluation required by 20 C.F.R. § 404.1520. At step one, he found that Leon had not performed substantial gainful work since the onset of his disability.[6] At step two, he found that Leon's impairment was "severe." However, at step three, he determined that Leon's impairment did not meet or equal the criteria for an impairment listed in the regulations. At step four, he found that Leon's impairment did prevent him from doing his past relevant work, which had included clerical work and office automation work.

Once the ALJ made the determination at step four that Leon's impairment prevented him from doing his past relevant work, the burden shifted at step five to the Commissioner to determine Leon's "residual functional capacity"[7] and establish by

---

[6] Leon's job at the recreation center did not amount to "substantial gainful work" because it was too few hours per week at a low rate of pay.

[7] The "RFC is an assessment of the individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling 96-8p at *1. To determine the claimant's RFC, the ALJ must consider the relevant medical evidence and other evidence of the claimant's condition in the record, including testimony from the claimant. 20 C.F.R. § 404.1529(c)(3) (2004).

substantial evidence that there exists work in significant numbers in the national economy that Leon could perform despite his impairment or combination of impairments. 20 C.F.R. §§ 404.1505-6; 416.945-6. In this case, the ALJ found that Leon retained a "residual functional capacity to perform unskilled work with limited general public contact." A.R. 30. The ALJ specifically found that Leon had no physical impairments but was scared to be around people. Given this residual functional capacity, the ALJ concluded, based on the vocational expert's testimony, that there existed work in significant numbers in the national economy that Leon could perform such that he was "not disabled" under the Social Security Act.

In reaching his conclusion as to Leon's residual functional capacity, the ALJ significantly discounted the testimony of the plaintiff himself, finding that "the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible." A.R. 30. As he had done in his first decision, the ALJ in his second decision gave little weight to the opinion of treating therapist Bartlett. He also accorded little weight to the Mental Impairment Questionnaire filled out by Dr. Krause just a few weeks before the second hearing. In discounting Bartlett's and Krause's opinions regarding Leon's work capabilities, he found those opinions

inconsistent with certain treatment notes in the record, giving "significant weight" instead to the out-of-context progress notes of Drs. Green and Sacks and the assessment of Dr. Cronin, which he found were "consistent with the ability to perform unskilled work." However, the ALJ selectively chose the portions of the reports of Drs. Green and Sacks that fit his view of the case and failed to appreciate their overall view of Leon's condition. For example, Dr. Sacks endorsed the very Mental Impairment Questionnaire signed by therapist Bartlett, which the ALJ rejected, and neither Dr. Green nor Dr. Sacks ever wrote or otherwise indicated that Leon was capable of performing full-time work independently. In his second decision, the ALJ did not even weigh the opinion of therapist Watson, although therapist Watson had treated Leon for two years, had authored a significant number of the treatment records in the administrative record, had endorsed the Mental Impairment Questionnaire signed by Dr. Krause, and had testified at the second hearing. In fact, while Leon presented significant current information about his progress, the ALJ never had Dr. Cronin update her assessment of Leon's functioning.

IV. Discussion

    A. Standard of Review

    Judicial review of a final decision by the Commissioner regarding disability benefits is limited to determining whether

the findings are supported by substantial evidence and whether the correct law was applied. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). Substantial evidence is "'evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla but may be somewhat less than a preponderance.'" English v. Shalala, 10 F.3d 1080, 1084 (4th Cir. 1993) (quoting Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984)). However, a factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law. Coffman v. Bowman, 829 F.2d 514, 517 (4th Cir. 1987). Although the reviewing court is not to try the case de novo or resolve evidentiary conflicts, neither may it abdicate its responsibility to give careful scrutiny to the whole record to ensure that there is a sound foundation for the final decision of the Commissioner. Vitek v. Finch, 438 F.2d 1157, 1157-58 (4th Cir. 1971).

Because the ALJ's finding that the plaintiff is "not disabled" relied on a vocational expert's testimony, that finding can only be upheld if there is substantial evidence in the record to support the hypothetical residual functional capacity included in the ALJ's hypothetical questions to the vocational expert. See Morgan v. Barnhart, 142 Fed. Appx. 716, 720-21 (4th Cir. 2005) (unpublished) ("The Commissioner can show that the claimant is not disabled only if the vocational expert's testimony that

jobs exist in the national economy is in response to questions from the ALJ that accurately reflect the claimant's work-related abilities.") (citing Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)).

    B. Analysis

    As discussed above, there is no substantial evidence in this record upon which the ALJ could have reasonably concluded that Leon was capable of "sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Only Dr. Cronin's desk audit, conducted in 2003 and never updated, supports that conclusion. No other treating physician or therapist came to that conclusion, and the most recent report of treating physician Dr. Krause directly conflicts with that opinion.

    An even more fatal flaw in this record is the failure of the ALJ to posit an accurate hypothetical to the vocational expert. In the first hearing, the ALJ asked the vocational expert to "assume a hypothetical person who has the same age, education, and work experience as the claimant and who has the capacity to do light work, unskilled, with a sit/stand option and limited general public exposure." A.R. 763. This hypothetical assumed that Leon was capable of sustained, independent work and failed to include the numerous mental health limitations found not only by the plaintiff's treating psychiatrists and therapists, but

16

also the moderate limitations acknowledged by Dr. Cronin, the Commissioner's own mental health consultant. Even discounting the opinions of the treating therapists that Leon was incapable of sustained independent work, the hypothetical failed to take into account the "moderate" limitations on Leon's ability to understand, remember, or follow instructions, to work a normal day or week without interruption, and to maintain concentration, persistence, or pace as recognized by Dr. Cronin, to whom the ALJ afforded great weight.

In the second hearing, notwithstanding the Appeals Council's explicit direction that on remand that the ALJ "adequately address the work related limitations the claimant's mental impairments would impose" and address "why the claimant would be limited to light work or require a sit/stand option," the ALJ asked almost exactly the same questions of the plaintiff and posed the exact same hypothetical to the vocational expert that were found insufficient by the Appeals Council. He then asked an additional question of the vocational expert, who was to "assume a hypothetical person of the same age, education and work experience as the claimant who has the capacity to do sedentary work, unskilled, with a sit/stand option and limited general public contact." A.R. 784. The change from "light work, unskilled" to "sedentary work, unskilled," in this second question totally failed to take into account any of Leon's

17

confirmed mental health limitations. The ALJ's inclusion of a work option with "limited general public contact" appears to be the only restriction included to reflect Leon's non-exertional limitations, but this one limitation clearly failed to address Leon's numerous other limitations noted by his physicians, such as chronic fatigue, inability to function independently, and intermittent anxiety and depression.

As the Fourth Circuit has consistently held, "in order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record...and it must be in response to proper hypothetical questions which fairly set out all claimant's impairments." Walker v. Bowen, 889 F.2d 27, 50 (4th Cir. 1989) (citations omitted). Moreover, the regulations promulgated in the C.F.R. call for a much more thorough consideration of the evidence than the ALJ's written decisions reflect. For claimants such as Leon who suffer from chronic mental impairments, the C.F.R. provides that

> [The claimant] may commonly have [his] life structured
> in such a way as to minimize [his] stress and reduce
> [his] symptoms and signs. In such a case, [the
> claimant] may be much more impaired for work than [his]
> symptoms and signs would indicate...It is, therefore,
> vital that we review all pertinent information relative
> to [the claimant's] condition, especially at times of
> increased stress. We will attempt to obtain adequate
> descriptive information from all sources that have
> treated [the claimant] in the time period relevant to
> the determination or decision. 20 C.F.R. 404, Subpt. P,
> App. 1 (emphasis added).

The C.F.R. also calls for careful consideration of the side effects of medications:

> Drugs used in the treatment of some mental illnesses may cause drowsiness, blunted effect, or other side effects involving other body systems. We will consider such side effects when we evaluate the overall severity of your impairment. Where adverse effects of medications contribute to the impairment severity and the impairment(s) neither meets nor is equivalent in severity to any listing but is nonetheless severe, we will consider such adverse side effects in the RFC assessment. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Finally, the C.F.R. requires attention to the living environment of a claimant with mental impairments:

> Particularly in cases involving chronic mental disorders, overt symptomatology may be controlled or attenuated by psychological factors such as placement in a hospital, halfway house, board and care facility, or other environment that provides similar structure....Such settings may greatly reduce the mental demands placed on [the claimant]. With lowered mental demands, overt symptoms and signs of underlying mental disorders may be minimized. At the same time, however, [the claimant's] ability to function outside of such a structured or supportive setting may not have changed. <u>If [the claimant's] symptomatology is controlled or attenuated by psychosocial factors, we must consider [the claimant's] ability to function outside of such highly structured settings</u>. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (emphasis added).

In this case, in addition to posing an inadequate hypothetical question to the vocational expert, the ALJ disregarded without justification much of the mental health evidence, including Leon's sporadic problems with personal hygiene, anxiety, and depression. He failed entirely to consider or even probe the fact of Leon's structured living environment

and his inability, even in such an environment, to maintain
regular contact with staff and adhere to a regular sleep
schedule, or to consider the side effects of his medications,
although the record is replete with references to Leon's problems
with drowsiness and fatigue. The ALJ picked scattered references
to progress out of the records provided by Drs. Green and Sacks,
but failed to consider the treatment notes as a whole and relied
almost entirely on the single review of Dr. Cronin, a non-
treating physician, in determining that Leon was capable of full-
time work and therefore not disabled.[8] A.R. 29-31.

    Moreover, the ALJ disregarded without explanation the

---

[8] The failure to cite specific reasons for ignoring these
findings is itself a reversible error. "'Since it is apparent
that the ALJ cannot reject evidence for no reason or for the
wrong reason...an explanation from the ALJ of the reason why
probative evidence has been rejected is required so that a
reviewing court can determine whether the reasons for rejection
were improper.'" See v. Washington Metropolitan Area Transit
Authority, 36 F.3d 375, 384 (4th Cir. 1994) (quoting Cotter v.
Harris, 642 F.2d 700, 706-07 (3d Cir. 1981)). Although the ALJ
explained why he rejected Dr. Krause's and therapist Bartlett's
opinions, he gave no reasons for disregarding the portions of Dr.
Cronin's report detailing Leon's limitations that were in accord
with the evaluations of every other mental health professional
who evaluated Leon. He further gave no reason for disregarding
therapist Watson's evaluation and opinions, or Dr. Sack's
endorsement of therapist Bartlett's evaluation.
    Moreover, as noted earlier, Dr. Cronin was the only
physician or therapist to explicitly find Leon capable of
performing full time work. The Fourth Circuit has held that an
opinion of a non-examining, non-treating physician is not
substantial evidence when it is contradicted by all other
evidence in the record. Millner v. Schweiker, 725 F.2d 243, 245
(4th Cir. 1984)(citing Hall v. Harris, 658 F.2d 260, 265-66 (4th
Cir. 1981)).

answers given by the vocational experts when Leon's limitations were included in hypothetical questions posed to them.[9] The ALJ evidently concluded that the additional factors, which were taken directly from treating physicians' reports, were not supported by substantial evidence, and therefore made no mention of the vocational expert's answers to Barrios's questions in his final decision. The non-exertional limitations such as fatigue, inability to comply with instruction or function independently as reported by treating physicians and therapists, however, closely mirror many of the moderate limitations found by Dr. Cronin in her Mental Assessment on September 3, 2003. These non-exertional limitations should have been provided to the vocational expert and were therefore appropriate to consider.

Because the ALJ's second decision was based on an inadequate

---

[9] In the first hearing, Barrios cross-examined the vocational expert by asking her, "if you were to add certain limitations to an individual who has problems maintaining concentration of for more than two hours, and also the person won't be able to attend his work regularly because of his mental illness, and also that he won't be able to tolerate work stress, and this is based on what Ms. Bartlett, the therapist of Mr. Leon is saying. Does this individual can or can this individual perform these jobs?" The vocational expert answered, "No, sir." A.R. 764-65.

In the second hearing, the ALJ interrupted Barrios's cross-examination of the vocational expert and asked the following hypothetical: "assume that hypothetical individual who has same [sic] age, education and work experience and who has limitations regardless of what they are, limit performance to less than 80 percent required by an employer, would that change your conclusions and, if so, how?" The vocational expert answered, "yes, sir, that would render one unable to maintain more secure work in the national or local economy." A.R. 786.

consideration of the defendant's mental impairment, including the

side effects of his medications and inability to live

independently, as well as the flawed questioning of the

vocational expert, which did not accurately reflect the

claimant's non-exertional work-related limitations, it was not

based upon a consideration of all of the relevant evidence in the

record and is therefore not supported by substantial evidence.

V. Conclusion

 For the reasons stated above, the decision of the

Commissioner will be reversed and this matter will be remanded to

the Commissioner with a direction to award benefits to the

plaintiff.

An appropriate Order will issue with this opinion.

Entered this 6th day of March, 2007.


_____/s/_____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia